FILED
07/31/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2019

## ANTONIO TERRELL PEWITTE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2014-A-511        Angelita Blackshear Dalton, Judge**

_____

### No. M2018-01704-CCA-R3-PC

_____

The Petitioner, Antonio Terrell Pewitte, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2015 conviction for aggravated child neglect and his twenty-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Chad Davidson, Nashville, Tennessee, for the appellant, Antonio Terrell Pewitte.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Jan Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In 2014, the Petitioner was indicted for two counts of aggravated child abuse and two counts of aggravated child neglect. At the trial, the Petitioner was convicted of one count of aggravated child neglect, and the jury acquitted him of the remaining counts. This court affirmed the conviction and summarized the facts of the case as follows:

> . . . . Defendant and his girlfriend, Mother, had been dating for almost three years at the time of the incident. She had a son, M.O., and a daughter, N.C., who was six years old. Mother and her children lived with Defendant and his young son.

On the evening of December 1, 2013, Mother was at work, and Defendant was watching her children. Before dinner, N.C. went into the bathroom next to the kitchen and began washing her hands with cold water. Defendant and the other children were at the kitchen table waiting on N.C. to finish washing her hands so that they could begin eating together. Defendant joined N.C. in the bathroom and turned the faucet handle to hot water. Defendant then "grabbed" her wrists and put her hands under the hot water so that the water ran over the back of her hands and thumbs. N.C. testified that the hot water was "painful" and that she cried when she felt it. N.C. said that Defendant did not apply soap to her hands or rub her hands together while her hands were under the water. According to N.C., Defendant also "tried to put [her] face in the water."

N.C. thought that Defendant changed the water temperature because she was "taking too long," and she thought he was "angry." N.C. also testified that, prior to the incident, Defendant believed that N.C. was "messing with nail polish," so he punished her by making her "stand in the corner with one leg up and one leg down" while raising both of her hands to her head. N.C. thought that Defendant put her hands under the hot water on purpose and that it was not an accident.

Afterward, Defendant told N.C. to go sit down at the kitchen table, and she complied. During dinner, N.C.'s hands hurt and made it difficult for her to use her fork. Throughout the night, N.C. had trouble sleeping because her hands hurt.

M.O., who was twelve years old at the time of trial, testified that he was at the kitchen table and heard N.C. scream after Defendant went into the bathroom with her. M.O. saw that N.C.'s hands were red, but he did not recall Defendant doing anything to help treat N.C.'s hands. M.O. also heard N.C. "moaning" before she went to bed.

While Mother was at work, she talked with Defendant on the phone around half a dozen times. He told her that N.C. was playing with her nail polish and said that he was going to let Mother "handle it" when she got home. According to Mother, Defendant sounded "angry." On one of the phone calls, Defendant made N.C. tell Mother that she was in trouble because she "lied" about playing with the nail polish. Mother testified that she did not believe her daughter lied about the nail polish because N.C. was crying on the phone. Although they spoke on the phone numerous times, Defendant never called Mother to tell her that N.C.'s hands were burned, and he did not mention the

incident to Mother when she returned home from work. Mother's shift ended at 11 p.m. When she got home, she fell asleep on the couch in the living room.

The following morning, N.C. awakened Mother and said that her hands hurt. Mother observed that there were blisters on the front and back of N.C.'s hands. The blisters covered "most" of her hands. Mother was "shocked" and "worried." Mother woke up Defendant and asked him what happened.

Given the nature of the injuries, Mother thought that N.C. needed to go to the hospital, but Defendant disagreed. Defendant told Mother that she was "stupid" and said that N.C. "didn't need to go to no f***ing hospital." Then, Defendant soaked N.C.'s hands in rubbing alcohol and tried to "pop" the blisters with a safety pin. Mother went to the store and bought gauze wrap and Neosporin cream. She used both to treat N.C.'s hands.

Mother called her mother, Carla Agins, and told her about what happened. After learning that N.C.'s hands were burned, Ms. Agins called 911 and the hotline for the Department of Children's Services. According to Ms. Agins, Mother seemed scared because she was whispering on the phone.

Detective Jeffrey Gibson of the Nashville Police Department went to the house and inspected the bathroom where the incident occurred. When Detective Gibson arrived, Defendant was cooperative and seemed "visibly upset." The sink's faucet had a single lever which turned back and forth horizontally to change the water temperature. Detective Gibson turned on the hot water as high as it would go and then he used a digital thermometer to check the temperature of the water over a period of about two minutes. The temperature of the water fluctuated, but the highest reading was 141.6 degrees Fahrenheit, and the most consistent temperature reading was around 131.6 degrees Fahrenheit. When Detective Gibson checked the water temperature with an analog thermometer, it reached almost 130 degrees Fahrenheit. While the water was running, steam would come from the water intermittently.

After checking the hot water heater, Detective Gibson discovered that the temperature control dial was on the setting just below the hottest. The hot water heater was located next to the bathroom, so the water would not have had to travel far before reaching the bathroom faucet. Mother testified that she had not adjusted the hot water heater temperature settings. She was not aware that anyone had previously been burned by the hot water in their home. The

house in which they lived was government-owned housing, so the tenants did not handle maintenance issues.

An ambulance took N.C. to the hospital, where she remained for six days, during which she received aqua therapy and had to perform exercises "to keep flexibility in her hands." N.C. stayed on pain medication throughout the hospitalization. Mother had to change N.C.'s bandages twice a day after N.C. was discharged, and N.C. had to continue doing flexibility exercises for two months.

Carrie Donnell was a nurse practitioner at Vanderbilt University Medical Center who evaluated N.C. in the emergency department on the day after the incident. The trial court certified her as an expert in child abuse pediatrics without objection. Ms. Donnell described N.C.'s injuries as a mix of superficial thickness burns and partial thickness burns located on "the palm and the back of her hand and then extended from her wrist down to her fingers" on each hand. Ms. Donnell explained:

> [B]urns are described . . . on a continuum being partial thickness to full thickness burns. And within partial thickness, you can have superficial and deep partial thickness burns. So, if you think about a superficial burn, it would be like a sunburn, redness to the skin, but no loss of skin. And then, as the burn progresses and gets . . . deeper, you will have blistering and loss of skin. In a full thickness burn, [it] would enter into subcutaneous tissue and even bone.

The majority of N.C.'s burns were partial thickness burns, including deep partial thickness burns on both hands. Ms. Donnell explained that "superficial and partial thickness burns are actually more painful than full thickness burns . . . because the nerve endings are exposed but not yet killed off, . . . and the full thickness burns are so deep that the nerve endings are just completely [gone], . . . so you don't actually feel that sensation anymore." Because N.C.'s burns were of the former type, they required "ongoing pain management" until they healed.

After N.C. sustained the injuries, "her hands would have been obviously very red. While they might not have been blistered immediately upon burn—that would have developed over some time—but it would have been clear to any prudent caregiver that she had been injured." Ms. Donnell explained that immediate medical attention is "very important" for a child with

such injuries in order to reduce the risk of developing "difficulty in flexing that extremity or body part." Ms. Donnell testified that popping the blisters and applying burn ointment was not "an appropriate form of medical intervention" for N.C.'s injuries because opening a wound increases the risk of infection. N.C.'s injuries caused loss of pigmentation to her skin and also reduced the range of motion in her hands.

Ms. Donnell testified that the burns on N.C.'s hands were consistent with both hands having been placed "perpendicular to the floor" with the thumbs upwards underneath the hot water. According to Ms. Donnell, a child can comfortably wash in hot water with a temperature of about 101 degrees, and burns can begin forming at 113 degrees with prolonged exposure. A child like N.C. would be expected to cry out in pain and withdraw from 113-degree water. Accordingly, N.C.'s injuries were not accidentally self-inflicted. N.C.'s burns required "increased temperature and increased exposure time" beyond that of quick contact with 113-degree water. Ms. Donnell testified that, in water of 130 degrees Fahrenheit, it would take approximately six to ten seconds for a child to sustain the injuries that N.C. did. A full thickness burn would result after approximately one second from a child's exposure to water of 140 degrees Fahrenheit.

*State v. Antonio Terrell Pewitte*, No. M2015-02103-CCA-R3-CD, 2016 WL 6678534, at *1-3 (Tenn. Crim. App. Nov. 14, 2016) (footnote omitted), *perm. app. denied* (Tenn. Mar. 8, 2017).

On October 30, 2017, the Petitioner filed the instant petition for post-conviction relief, alleging, in relevant part, that trial counsel provided ineffective assistance by failing to present a "plumbing expert" to refute the prosecution's contention that, based upon the water temperature, the Petitioner acted knowingly and intentionally.

At the post-conviction hearing, trial counsel testified that he represented the Petitioner in criminal court, that he met with the Petitioner approximately twelve times at the jail before the trial, and that each meeting lasted approximately one hour. Counsel said that a portion of the defense was that an error could have occurred in the water heater, causing the temperature to spike or to have "bursts of hot water." Counsel agreed that the investigating officer's thermometer showed readings of 129 and 131 degrees and showed spikes in the temperature at 141. Counsel said that he researched topics such as burn safety and information, how fast burns occurred, scald burns, hot water problems, and public safety announcements about how to maintain water heater temperatures and what temperatures were safe. He said that a recommendation for water heaters was to have a thermostatic mixer

valve installed to balance the water temperature and to prevent temperature spikes. Counsel said that the investigating officer was not an expert witness in plumbing or water heaters.

Trial counsel testified that he consulted Dr. Foley about the victim's burns and that although Dr. Foley did not charge for the consultation, Dr. Foley provided information about how to approach the topic of burns, directed counsel to websites with helpful information, and provided information about problems with hot water. Counsel recalled reviewing medical journal articles about children and burns and reviewing public health information addressing water heater safety, including how to set the temperature on a water heater and how to prevent temperature spikes. Counsel's file contained some of the articles he reviewed, but he noted that the file did not contain all of his research.

Trial counsel testified that he did not present a medical expert, although he and the nurse practitioner who testified at the trial disagreed about whether the victim's burns could have occurred in a few seconds or minutes. Counsel said that initially the nurse practitioner believed the burns took minutes to occur, although the literature counsel had reviewed discussed the burn rate on the hands in terms of seconds. Counsel said, though, that the nurse practitioner later agreed with counsel that the burns occurred in seconds.

Trial counsel testified that the investigating officer measured the water temperature from the faucet using digital and analog thermometers, that the temperature readings ranged from 129 to 131 degrees with a spike of 141 degrees, and that the recommended water temperature was around 120 degrees, which was significantly lower than the temperature readings from the faucet. Counsel did not recall showing this information at the trial. Counsel said that "in hindsight" an expert could have established the average water temperature coming from the faucet, whether the water temperature was normal or an aberration, and whether a thermostatic mixer value was installed on the water heater. Counsel was unsure whether the trial court would have allowed such an expert because of the "general nature" of the information.

Trial counsel testified that he and the Petitioner discussed the information Dr. Foley provided but that he did not tell the Petitioner the defense intended to present a medical expert to testify about the victim's burns. Counsel recalled that the water heater was made by Honeywell but did not recall researching any problems associated with Honeywell water heaters. Counsel agreed that a water heater engineer was not presented at the trial.

Trial counsel testified that the Petitioner and the victim's mother, along with the victim and her brother, lived in public housing and that records showed the victim's mother had contacted the housing authority to address issues with the water heater. Counsel said that the victim's mother confirmed at the trial that she called the housing authority about the

water heater after the incident in this case. Counsel obtained maintenance records, which did not show any maintenance before the incident.

On cross-examination, trial counsel testified that the defense was accidental burns, that the parties did not dispute that the victim was burned by the water from the bathroom faucet, and that the primary issue in this case was the Petitioner's intent. Counsel recalled that the State's theory was that the Petitioner intentionally held the victim's hands under the water and that the defense's theory was that the burns occurred accidentally. Counsel agreed that although an issue existed about the temperature setting of the water heater, the victim's burns were severe and obvious. Counsel said, though, that due to the severity of the burns the water temperature and the amount of time the victim's hands were under the faucet were relevant.

Trial counsel testified that he did not present Dr. Foley as a defense expert because he thought the testimony would harm the defense. Counsel said that the decision was made after evaluating Dr. Foley's potential testimony about the victim's burns. Counsel said the defense requested that the State provide notice of whether it intended to call expert witnesses beyond the nurse practitioner who treated the victim. After reviewing the maintenance records, counsel agreed that the housing authority showed one maintenance request for the water heater after the incident in this case. Counsel recalled that the State objected on the basis of relevancy to any maintenance record outside the time frame of the incident in this case.

The Petitioner testified that although he knew trial counsel had talked to someone about this case, he did not know if counsel had secured an expert medical witness. The Petitioner denied asking counsel whether he intended to present an expert from the Occupational Safety and Health Administration (OSHA) to testify about the water heater. The Petitioner denied knowing that counsel had obtained the maintenance records from the housing authority. The Petitioner said that he had heard other tenants had complained about water heater temperatures being too high and that he asked counsel to investigate it. He said counsel should have obtained an expert to show that the victim's hands were under the water for "just a couple of seconds."

On cross-examination, the Petitioner testified that he and the victim went to the bathroom to wash her hands before eating dinner. He said that he grabbed the victim's wrists, that he held her hands under the water, that he turned around to tell his two-year-old child to sit down, and that when he turned back around, the victim said her hands hurt. He said that his hands were not under the faucet but that his "top fingers" touched the water. He denied that held the victim's hands under the water and said that he was washing her hands. He said that if he had not turned around, he would have noticed the water was too hot and that he was not paying attention. He said that the victim's hands were under the water no

more than five seconds and denied that her hands were under the water for thirty to forty seconds.

The Petitioner testified that trial counsel should have presented an expert witness to show that the water temperature was too hot and that the burns occurred in a few seconds. The Petitioner agreed that he did not have expert testimony to present at the post-conviction hearing.

The post-conviction court denied relief. The court found that trial counsel investigated and subpoenaed the water heater records and that counsel made a strategic decision not to introduce the records at the trial because counsel believed the records did not benefit the defense. The court determined that counsel was not deficient in this regard and that the Petitioner had failed to prove his allegation by clear and convincing evidence.

The post-conviction court found that trial counsel attempted to show that an error caused the water temperature to spike, causing the victim's burns. The court found that counsel researched water safety in relation to burns, that counsel consulted with a medical expert who directed counsel to additional resources, and that, before the trial, counsel interviewed the nurse practitioner who treated the victim. Although noting that, in hindsight, trial counsel might have done things differently, the court determined that counsel made strategic decisions during his representation. The court concluded that counsel did not provide ineffective assistance. This appeal followed.

The Petitioner contends that the post-conviction court erred by denying relief. He argues that counsel provided ineffective assistance by failing to present an expert witness, such as a burn expert, an OSHA expert, or a water heater engineer, who could have testified about the spiking of water temperatures in an effort to explain how the victim's injuries could have occurred quickly. He asserts that such expert testimony would have shown the jury that the victim's injuries were accidental. The State responds that the post-conviction court did not err by denying relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Hill v. Lockhart*, 474 U.S. 52 (1985). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Trial counsel's credited testimony reflects that he consulted with a medical expert, Dr. Foley, who assisted counsel with research related to water temperature and burns. Counsel stated that although he consulted with Dr. Foley, counsel did not present medical testimony because counsel did not think Dr. Foley would have benefited the defense. Although counsel did not present expert testimony related to the water heater, counsel researched possible problems with the water heater inside the home and obtained the maintenance records.

In any event, the Petitioner did not present an expert at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court will not speculate about the potential testimony of an expert witness, and without proof of what an expert's testimony might have been, the Petitioner is unable to establish his ineffective

assistance allegation. As a result, the record supports the post-conviction court's determination that counsel did not provide ineffective assistance. The Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE